## HOLLAND *v.* THE CITY OF SAN FRANCISCO.

Where the charter of a corporation points out a particular mode of conveying its property, it can only be conveyed in the mode prescribed.

Municipal corporations are compound beings. They exercise governmental powers, and also possess the capacity to receive and dispose of their property, like private individuals. In the former capacity, the exercise of its delegated discretion cannot be controlled by the judiciary, but in the latter, its acts are subject to judicial control.

A corporation acting in the disposal of its property, under a full knowledge of the facts, cannot plead ignorance of the law, and its contract being binding on it, is also binding upon the parties purchasing.

Where an ordinance for the sale of city property was passed without the majority required by the charter, and before the sale, another ordinance was legally passed, appropriating a portion of the proceeds to arise from the sale: *Held,* that the second ordinance was a sufficient recognition of the first to render the sale valid and binding on all parties.

Ordinances for the sale of property of a municipal corporation, are subject to the rules of interpretation applicable to the written instruments of individuals, and not to those by which laws are construed.

*Per Murray, C. J., dissenting.*—An ordinance appropriating the proceeds of a sale to take place by virtue of a former supposed ordinance, cannot be construed so as to remedy the defects of the first ordinance.

In cases involving questions of confirmation, a party is not necessarily presumed to know the law. This is a fact to be established, and even admitting the presumption to arise, it is not conclusive as against facts which go to establish ignorance of the law.

The charter of the city of San Francisco gives her the power to convey her property by law; and if an ordinance for this purpose is a law, it must be governed by the same rules of construction as other laws.

The city of San Francisco, in the sale of beach and water-lot property, acted in the capacity of a *trustee* of the State, under a delegated statutory power, which must be strictly pursued.

The prohibition against contracting debts over a certain amount, contained in the charter, applies to contracts and appropriations, but does not affect liabilities which the law may cast upon the city.

APPEAL from the District Court of the Twelfth Judicial District, City and County of San Francisco.

Holland, the plaintiff in the Court below, brought this action in the form of money had and received, against the city of San Francisco, to recover back the sum of four thousand and seventy-eight dollars, which he had paid defendant on account of certain real estate he had purchased of her at a public sale, on the twenty-sixth of December, 1853. The answer of defendant set up that the ordinance under which the sale was made had become valid by virtue of an ordinance passed subsequently thereto, appropriating a portion of the proceeds to arise from said sale to city uses, and also averred that at the time of the receipt of plaintiff's money, the debts and liabilities of the city exceeded the sum of fifty thousand dollars over and above her annual income; and that plaintiff's claim had not been created in conformity with her ordinances or charter, and was therefore void.

The case, by consent, was tried before the Court below, without the intervention of a jury, who found the following facts:

That in the month of December, 1853, there was passed, by the common council of the city of San Francisco, a certain ordinance, or what what purported to be an ordinance, which was known and designated as Ordinance No. 481, which is in the words and figures following, viz.:

Ordinance No. 481—To provide for the sale of certain city property.

*The People of the City of San Francisco do ordain as follows:*

§ 1. That the mayor and joint committee on land-claims of the city of San Francisco are hereby authorized and required to sell at public auction, after not less than ten days' advertisement in three of the daily papers, to the highest bidder, at such time and place as they may think advisable, all those pieces and parcels of land and water situated in the city of San Francisco, and described as follows, viz.:

First piece or parcel, bounded on the north by Clay street, on the south by Central Wharf, on the east by the west line of Drumm street, and on the west by Davis street. Second piece or parcel, bounded on the north by Central Wharf, on the south by Sacramento street, on the east by the west line of East street, and on the west by the east line of Drumm street. Fourth piece or parcel, bounded on the north by Central Wharf, on the south by Sacramento street, on the west by the east line of Drumm street, and on the east by the west line of East street, which east and west line of East street shall be continued westwardly and northerly, in its present direction, to its junction with the south line of Clay street.

§ 2. Said pieces of land and water shall be surveyed under the supervision, and as the mayor and joint committee on land-claims may direct.

§ 3. Twenty-five per cent. of the net proceeds of said sale shall be paid on the day of sale, in cash, or State indebtedness receivable for public dues by the State, which amount shall be paid to the State of California pursuant to the act of the Legislature, approved twenty-sixth day of March, 1850. Fifty per cent. to be paid in sixty days thereafter, in cash, or city warrants that may have been issued on or after May 1, 1851; and the balance of twenty-five per cent., payable in four months from date of sale, in cash, or three per cent. city scrip issued prior to May 1, 1851, and which may have not been funded, as provided by an act of the Legislature of this State authorizing the funding of the floating debt of the city of San Francisco, and to provide for the payment of the same.

§ 4. The mayor shall execute, on behalf of the city, a bond to each purchaser at the time of first payment, that when the

whole of the purchase-money is paid, the city shall give to the purchaser a deed for the whole lot or lots purchased. And on the payment of the last instalment, then the mayor shall execute a deed to the party lawfully entitled to the same under sale.

§ 5. That the eighth section, title four, chapter four, of an ordinance to revise, codify, and amend the general ordinances of the city of San Francisco, approved November 4, 1852, and all other ordinances, or parts of ordinances, conflicting with this ordinance, be and the same are hereby repealed.

FRANK TURK,
President of Board of Assistant Aldermen.
JOSEPH F. ATWILL,
President of Board of Aldermen.

Approved December 5, 1853.

C. K. GARRISON, Mayor.

That at the time of the passage of the aforesaid pretended ordinance, the board of assistant aldermen was composed of seven members, one member having resigned, and his place not having yet been filled. And that this said ordinance received in the board of assistant aldermen four votes only in its favor, to three votes against it. That the said ordinance received the requisite number of votes in the board of aldermen, and was signed by the mayor on the fifth of December, 1853.

That on the twenty-sixth of December, 1853, the common council of said city passed a certain other ordinance, designated as Ordinance No. 493, which said ordinance was duly passed by both boards of the common council, and received the signature of the mayor. And which said last mentioned ordinance is as follows:

Ordinance No. 493—Appropriating one hundred and eighty-five thousand dollars to the Sacramento Central Joint-Stock Clay Street Wharf Companies, and William E. Dennis.

*The People of the City of San Francisco do ordain as follows:*

§ 1. That the sum of one hundred and eighty-five thousand dollars be and is hereby appropriated from the cash proceeds of the second payment for the city property, ordered sold by Ordinance No. 481, to the Sacramento Central Joint-Stock Clay Street Wharf Companies, and William E. Dennis.

§ 2. That the Comptroller be and he is hereby authorized to issue, on the day of sale of the property ordered sold by Ordinance No. 481, his warrants upon the treasury as follows: For the sum of seventy-five thousand dollars, in favor of the Sacramento Street Wharf Company. For the sum of seventy-five thousand dollars, in favor of the Central Wharf Joint-Stock Company. For the sum of thirty-five thousand dollars, in favor of William E. Dennis. Said warrants shall be payable from the

cash proceeds of the second payment for the property ordered sold as aforesaid, or shall be received in payment for any purchases made at said sale, in accordance with the terms of Ordinance No. 481.

FRANK TURK,
President of Board of Assistant Aldermen.
JOSEPH F. ATWILL,
President of Board of Aldermen.

Approved December 26, 1853.

C. K. GARRISON, Mayor.

That the foregoing ordinance was signed by the mayor about one-half an hour before the sale hereinafter mentioned; and that on the said twenty-sixth day of December, and after the ordinance had been signed by the mayor, the mayor and the joint committee on land-claims, which committee consisted, besides the mayor, of two members from each board of the common council, and was a standing committee of the common council, proceeded to sell at public auction the land mentioned and described in said Ordinance No. 481.

That said sale purported to be a sale by the city of San Francisco of the property mentioned in Ordinance No. 481; that it was advertised for ten consecutive days preceding the same in more than three daily newspapers printed and published in the city of San Francisco; that at said sale, there were present the mayor, the committee on land claims, and nearly all the members of both boards of the common council; and that no person whatever protested against or objected to the sale; that the sale was conducted in accordance with the directions of said Ordinance No. 481; that the prices were favorable to the city, and that the said property since that time has decreased in value, and at the time of suit brought, was not worth more than one-half of the price brought at said sale; that at said sale, the plaintiff, Nathaniel Holland, bid off lot numbered eighty-nine for the sum of seven thousand nine hundred dollars; that on the twenty-seventh December, 1853, a bond was signed, sealed, and delivered to plaintiff, and accepted by him; said bond being sealed with the seal of said city, and authenticated by the signature of the mayor, which seal was so affixed by the authority and direction of the mayor, which said bond was conditioned for the conveyance of the lot in question, by the city, on payment of the purchase-money; that on the 27th day of December, in the year 1853, the said plaintiff paid to the land committee, and the land committee to the treasurer of the city of San Francisco, the sum of two thousand and seventy-eight dollars; that on the twenty-eighth of February, 1854, the plaintiff paid to the land committee, and the land committee to the treasurer of the city of San Francisco, the further sum of two thousand dollars;

that said money was paid on account of said pretended sale, and was used by the said treasurer in the payment of warrants drawn against the city treasurer; that on the seventh day of April, 1854, the common council passed a joint resolution, designated as Joint Resolution 400, directing, among other things, the committee on land-claims to make to the common council a full report of said sales; and that said committee did accordingly make a report thereof to the common council on the twenty-first of April, 1854; that on the twenty-sixth of March, 1851, the Legislature of the State of California passed an act entitled an act to provide for the disposition of certain property in the State of California, which act is hereby made part of the finding; and that the common council of the city of San Francisco, on the fifth of April, 1853, by ordinance duly passed, accepted the grant contained in said act, and all the conditions therein contained, and directed the payment of twenty-five per cent. of all of the proceeds arising from the sale of the property therein granted (embracing the lot in question) to the State. That there has been paid to the joint committee on land-claims, and also to the treasurer of the city of San Francisco by other purchasers at the said sale of December 26th, 1853, large sums of money and State and city comptroller's warrants, including warrants issued under Ordinance No. 493; and that of the moneys and warrants so paid to the joint committee, a large portion was paid by them to the treasurer of the city; that the plaintiff entered into possession of said lot in the month of March, 1854, and has expended thereon the sum of three thousand dollars in improvements, and is now in possession thereof, and has received forty-seven dollars rent thereon; that at the time of the said several payments in warrants, or otherwise, made by the plaintiff on account of said sales, the city of San Francisco was indebted in the sum of fifty thousand dollars and upwards, over the annual revenue of the city, excluding from such indebtedness the interest thereon existing on the fifteenth day of April, 1851; that of the proceeds of said sales, there was paid to the State fifty thousand dollars in State indebtedness, receivable for public dues by the State, by the land committee, being twenty-five per cent. of the proceeds of said sales which had been paid at that time; and that sixty thousand dollars of such indebtedness was attached in a suit against the city, in the hands of D. S. Turner, then treasurer of the city, in whose hands the said last-mentioned warrants still remain.

The Court rendered judgment in favor of plaintiff and against the city, for the full amount claimed. Defendant moved for a new trial, which being denied, this appeal was taken.

*William Duer*, and *Hoge & Wilson*, for Appellant.

The action of the plaintiff is founded on the hypothesis, that
24

the person with whom a contract is made by an agent without authority, may disaffirm such contract at any time before a ratification by the principal.

Ordinance 493 conferred a perfect authority on the mayor and joint committee to make the sale in question.

Ordinance 481 was a power of attorney, defective from not having been executed by all the requisite parties.

Ordinance 493 supplied this defect. It was a ratification of Ordinance 481.

It is said that Ordinance 481 was absolutely void, that it must be treated as a rejected ordinance. Admitting this to be so, the case is not worse than that of an agent in ordinary cases, who acts without any authority whatever; the absolute destitution of authority admits of no degrees; yet it is a familiar principle, that such acts may be confirmed. Story on Agency, §§ 240, 241, 242.

It is also contended, that Ordinance 493 was passed, in the belief that Ordinance 481 was a valid ordinance, and, that it would not have been passed, if it had been known that that ordinance was invalid. This is mere assumption, without proof, and the fact irrelevant if proved. The ordinance is passed, it is clothed in the forms required by the charter, and has all the efficacy which the charter gives to ordinances thus passed. Could evidence be adduced to show what were the individual opinions of the members of the council as to the validity of Ordinance 481, and how they would have voted if they had supposed that ordinance illegal?

But whether or not we call Ordinance 493 a ratification of Ordinance 481, still it is good as an original authority to sell the land. It would have been good for that purpose, though the mayor and committee had been proceeding to sell without any ordinance having passed, and without color of right. It is the plain intent of the act to authorize the sale, because it refers to it as a thing to take place, makes an appropriation of the moneys arising from it, and directs that to be done, (namely: the receipt of warrants for the purchase-money,) which could not be done without a sale.

Here, the city by Ordinance 493, asserts the validity of Ordinance 481, and consequently, the authority of the agents to sell; the plaintiffs, relying on that assertion, purchase the lots in question. And to permit the city now to deny this authority and refuse to convey, would operate to their injury, by depriving them of their right to the property, or to damages for a breach of the contract. In illustration of this rule, we refer to the following authorities: (2 Smith's Lead. Cases, 561–2; see definitions of Nelson, J., and Bronson, J., 3 Hill, 222; Sugden on Vendors, 522–3; Goddefroy *v.* Caldwell, 2 Cal. R., 489; Story's Eq. Jur., §§ 191, 193, and note; Burrows *v.* Lock, 10 Vesey, p. 470, 475;

1 Florida R., 2a.) Most of these cases show that estoppels operate in these cases, not on the ground of fraud or willful misrepresentation in making the statement, but on the ground that it would be a fraud to show that it was untrue to the prejudice of one who acted upon it. We also refer, as marked instances of the application of the rule, to cases where the statement was honestly, but ignorantly made, to the following authorities: Kingsby v. Vernon, 4 Sand. Sup. Court R., 361; Petre v. Peter, 21 Wend., 172.

Our next position is, that the sale was ratified by Ordinance 505, and the payment of money under it.

This ordinance directs the mayor and joint committee to pay certain sums of money to the officers of the police, out of the moneys received by them on the sale of the city slip property, and it is a fact, found by the Judge, that such payment was actually made.

Here is a direction, clothed in all the forms required by the charter for the most solemn legislative acts, to apply the proceeds of the sale to the benefit of the city, and an actual application of the proceeds in pursuance of such direction.

We have already noticed the familiar principle, that a ratification in part, ratifies the whole. Dunlap's Paley on Agency, 324; Story on Agency, § 250; Chitty on Contracts.

*Qui sentit commodum sentire debet et onus*—The benefit and the burden of the contract must go together.

Therefore, to receive or draw for the proceeds of a sale is, *per se*, a ratification. Story on Agency, § 253; Dunlap's Paley on Agency, 171, notes 324, 31, 32; 9 Cranch, 153; 4 Mason, 296; 1 Story R., 43; 1 Hall Sup. Court R., 247; and this is so, although there were no intention to affirm, and even a positive intention to disaffirm the sale. This rule, which is not more in accordance with the principles of justice than of positive law, is well illustrated in the case of The Farmers' Loan Company v. Walworth, 1 Comstock R., 433.

In delivering the opinion of the Court, Judge Bronson says: "It is true, the owners of the fund had the secret intention of falling back upon the first mortgage, if the foreclosure of the second should not produce enough to pay the debt. They intended to adopt the act of the clerk, so far as it was beneficial to themselves, and to reject the residue. That, the law would not permit them to do; they had no choice but to take the whole, or none; and when they confirmed the agency in part, they ratified the whole transaction." "This principle is so well settled, that I need do no more than refer to one or two books, where many of the authorities are collected." Same case, p. 447, and see authorities cited by counsel, p. 438, Dunlap's Paley, 31.

Our next position is, that laying aside the ordinances, there was

good parol authority to make the sale and a good parol ratifica-
tion of the sale when made, and that if there can be such a thing
as a parol estoppel, the defendants are estopped by every rule
of law, of equity, and of justice, from disputing the title of the
plaintiffs.

The mayor and common council (almost in mass,) were pres-
ent at the sale. The committee in making the sale, acted under
authority, assumed to be derived from them, and no one pro-
tested or objected; there has not merely been a passive acqui-
escence, but in repeated instances, the municipal authorities, the
mayor and common council, have acted upon, and with reference
to the sale, and never, in any manner, disaffirmed or repudiated
it; they have received the purchase-money, and paid debts with
it; they have permitted contracts to be made, and deeds given;
and they have suffered and encouraged the purchasers to go into
possession, to make valuable improvements on the land, and to
receive its rents and profits.

Even in England, where the strict rule that corporations can
only be bound by contracts made under their corporate seal still
prevails, if a corporation suffer improvements to be made on the
land, a parol contract may be specifically enforced, on the ground
of estoppel. Marshall *v.* Queensborough, 1 Sim. & L., 520.

The application of this rule to the present case, does not inter-
fere with the decision of this Court, that part performance does
not take a case out of the statute of frauds, because, here the
contract for the sale was in writing, and the authority of the
agent, as we have just seen, may be conferred by parol.

In these cases, the same presumptions are applicable to cor-
porations, and they are bound by estoppels, and liable on im-
plied contracts in the same manner as individuals. Ang. &
Ames, §§ 252, 238, 284, 240, 231, and cases cited; Bank of
United States *v.* Dandridge, 12 Wheat., 64; Foster *v.* La Rae,
15 Barb., 323; 6 Barb., 576, *et passim.*

The same rule applies to a municipal corporation in matters
relating to its property and contracts. It has been well said,
that " in reference to such transactions as affect its ownership of
property in buying, selling, or granting, and in reference to all
matters of contract, it must be looked upon and treated as a
private person." Per Heydenfeldt, J., in Touchard *v.* Touchard,
Cal. R., July Term, 1855; 3 Hill, 531, and cases cited; 2 Hill, 159;
1 Seld., 374. Indeed, the same rule applies even to a State.
United States Bank *v.* Planter's Bank, 9 Wheat, 904; Delafield
*v.* State of Illinois, 26 Wend., 192; 2 Hill S. C., 179.

Lastly, the relief of the plaintiffs, if any, is in equity, and not
by an action for money had and received. And in order to
enable them to sustain such action, it is necessary that that they
should abandon the possession of the land, surrender their con-
tract, and re-convey the property to the city.

The action for money had and received, is an equitable action, and the defendant may go into every equitable defence. The charge and defence are both grounded by the true equity and conscience of the case.  1 Doug., 138; 2 Burr., 1,010; 2 Comyn on Contracts; 2 Barb. R., 135, 146.

The only ground upon which the plaintiffs can recover, is that of a recision or disaffirmance of the contract; and it is necessary to entitle them to this remedy:

1. That the effect of a recovery would be to have the parties in *statu quo.*

2. That the plaintiffs should abandon or return whatever they have received on the contract.

3. It must appear that the defendant will be deprived of no right, and subjected to no inconvenience by allowing a recovery in this form.  2 Barb. R., 135; 5 Barb., 319; Abbott v. Draper, 1 Denio, 74; 4 Denio, 51; 4 Blackf., 515; 4 Alab., 362; 5 Barr, 516; Jackson v. Norton, Cal., July Term, 1855; 5 Gilman, 206–7.

*Pringle & Felton, and Baldwin,* for Respondents.

We make these propositions:

I. That the sale of the slip-lots was void, and passed no title. This was expressly decided in Kelsey Hazen's case.  5 California Reports.

II. That there has been no ratification of this sale.

First, Not by Ordinance 493, for these reasons:

1. That ordinance does not profess to be an act of ratification.

2. There was nothing to ratify—no sale had ever been made under 481.

3. Upon its face it shows that 481 was not intended to be ratified, (if such a thing could be,) for it was supposed 481 had already been complete.

5. Because the ordinance is a legislative act, and laws cannot be passed by implication; they are construed not as contracts, but as statutes.

6. Because this very question has been decided in Phelan v. Supervisors.

7. Because 493 could only, at most, take effect from its passage—which was only a half hour before the sale—and if it then validated 481, it validated from that time all of its provisions, one of which directed a sale on ten days' notice—which was not given.

8. Because the sale was made under 481 and not under 493; and the true construction of the charter is, that a sale of the land of the corporation can only be made after an ordinance passed enabling such sale; and, therefore, it could not be made under another ordinance, merely referring to an ordinance as having passed, which never had existence.

9. The mind of the Legislature must be brought to the very

fact of sale.   It is not the same thing to dispose, in a particular way, of the proceeds of sale, and to decree that the sale be made. A man may be willing to spend money in a particular way, if he has it, but may not be willing to sell his house to raise the money, for the purpose of spending it in that way.

10.  Because the use of the term "ratification," in this connection, is a clear misnomer.   There can be, of course, no ratification of an act not yet done.   The only thing that can be pretended is, that the power not having been given by 481, was given by 493; but a power can never be given without an intention to give it, any more than a contract can be made without an intention to make it.   Not only is there nothing imparting authority to sell in 481, but authority was refused when the question was put; and nothing in 493 giving authority to sell, but 493, on its face, assumes, by mistake, that authority had already been given to sell, in 481; refers to the sale as a sale to be made under authority of 481; thereby refuting the idea that there was to be any sale under 493; and the sale actually made was the sale ordered and advertised under 481.   It must be contended, therefore, that the mere repetition of a mistake in a law, makes the mistake true; that laws may be passed by the entry of the clerk—not by the votes of the Legislature; that if a Legislature refers to a law, however incidentally, as having passed, though it never was passed, the mere reference passes it, in despite of the Constitution or charter.

So, an appropriation of a dollar tax out of a bill supposed to be passed, would pass the bill, though it had been voted down; and a recital, in a bill, of a law having passed, passes the law, though it was a clear mistake.   In other words, there can be no legislative error—a statement in a law is conclusive; though a plain error every where else may be corrected.   So, if an act were passed, appropriating a small part of the proceeds of sales of school lands, or of swamp and overflowed lands, in a given way, this would be equivalent to a law regularly passed, ordering the sale of them!

The old rule was, that whenever the principle fell, the incident fell with it: the new rule is, that the creating of an incident, makes, of itself, a principle, to which the incident is to be attached.   The plain sense of the whole thing is, that the legislators are presumed to do what they have expressly declared they meant to do: not that from one act merely auxiliary to something else, they are construed as creating the substantive to which the adjective applies.   If this rule were different as to contracts, it could not apply to laws: for the making of a law is the sole act of the Legislature; it is to be taken absolutely as the will of the sovereign.   The making of a contract is the convention of two different minds—to be construed relatively—the parties to be bound, not only by what they have done, but what

they have given another to understand they have done : the views, rights, interests, intentions, and obligations, of both and each of the parties, are to be taken into the account. There may result, from policy and reason, implications as to contracts and to contracting parties : there can arise none as to law-makers and laws. To say that by 493 the will of the Council was, *by that law*, to order a sale of the slip property, is to say what the face of the paper and the conduct of the parties ignore. This is the reasoning in Phelan *v.* The Supervisors, and the only ground upon which those cases could be sustained. Nor will it do to say that the city was estopped by the passage of 493 : 1st, for the reasons above given. There can be no estoppel by the recital of a mistaken fact, when that recital does not mislead. The purchasers did not buy under, or know of, 493 having been passed : there were no parties to be estopped at the time of passing 493—the sale was had under 481.

11. The city was not estopped by matters *in pais*, as has been expressly decided in Phelan *v.* Supervisors. She could not be estopped, except by the acts of agents, which acts misled these purchasers, and were designed to influence them.

But it is perfectly clear that a special power, given to a municipal corporation, to act only in a prescribed way, cannot be satisfied by an estoppel against the corporation from denying that she had acted in that way. The result of such a doctrine would be really to destroy the power as the Legislature gave it, and all limitations and safeguards upon the power : for the council might evade it whenever they chose : they need not do as the charter requires, to sell land; but all that is necessary, *is to say* they have done what the charter requires : and so the power of selling would really be, not a power to sell as the law requires, but a power to sell as they chose—provided they chose to say, or to act as if they had done, what the law required. In other words, it would be held that a limitation on a power created by law, might be dispensed with whenever the agent chose to dispense with it.

The plain intent of the charter is, that land shall be sold *after the passage* of an ordinance, which ordinance shall prescribe the terms of sale. The sale must be by public auction. It follows that no sale can be made effective or valid, within the true meaning of the charter, unless that sale be made under, and in pursuance of, the ordinance therefor enacted.

It is a clear violation of this intent, to sell, then, not by virtue of an ordinance, but to pass title by virtue of loose acts *in pais*, or by vague implications.

This is true of all public statutory sales. There can be no ratification of such sales. There can be no confirmation of a sale which, to be valid *at all*, must have its validity from the very act of sale itself. Can a sheriff, or administrator, or commissioner,

sell at private sale and then confirm the sale? Or can he sell before he has his execution or his order of sale, and afterwards get such execution or order of sale, and then confirm? Surely not. Why? Because not only the terms of the power, but the policy of the law, allow of but one sale in one way. His only right comes from his authority to sell; if he has none, he has no power; his acts are wholly void, and acts wholly void cannot be confirmed by acts *ex post facto.* There is no difference in principle between one class of agents, created by public authority, and another, so far as this rule is concerned; no distinction between a sheriff or commissioner appointed by law, and acting under the order of a Court, and these municipal agencies, acting under a doubly delegated power from the Legislature to the corporate authorities, and from the latter to them. It is a special power, to be literally—certainly strictly, pursued. The reason of the rule is clear. It is not public policy that the laws of the land— whether directory or not—shall be set at naught by the agents of the State. The rule prescribed by the State is the very one its own wisdom has selected, and it is neither proper nor respectful to the State, to adopt another mode in contempt of legislative direction. The consequences of a violation cannot be foreseen; the extent of departure cannot be measured or limited: the Legislature have, therefore, wisely provided that there shall be no departure. It is a plain rule to hold the agents to conformity; it leads to litigation, speculation, confusion, and, in most cases, to eventual loss, to tolerate any material deviation. It opens the door to fraud and imposition, and, what is not to be overlooked, prevents a fair price being obtained for property, when only the shrewd and sagacious can speculate with any safety upon what is to be the effect of a sale not in conformity to the law.

The doctrine upon the other side proceeds upon the idea that this land was the property of the city, which she might do with as she chose, and, therefore, these matters of estoppel bind her as they would bind an individual. This is not true. The State gave this property to this corporation, reserving an interest in the sales to herself. She had a right to secure to herself what she had retained of this generous donation; even if she did not have the right, (we think she did,) as the sovereign, to control this corporation in the exercise of her corporate privileges, and this as well in regard to the disposition of her lands, as in regard to anything else. She exercises this control by prescribing the terms upon which the city shall sell this land; the city, whether agent or grantee, therefore, could not sell on any other terms. Neither the city nor the State, therefore, could be estopped by the act of any mere agent of the city, in selling what the agent was not authorized to sell. If so, then there never could be an invalid execution of a power, if the acts of the agents estopped

the principal; certainly they did not estop the State.   If the city took an unqualified fee in the *corpus* of the property, the Legislature had a right to say how that property should be disposed of, and it has said, expressly, that it shall be disposed of only in one way.   Neither by estoppel or otherwise, then, can it be disposed of in any other way.

It is submitted, that Ordinance 493 could not operate as a ratification of 481; or, in any wise, as an authority to sell, or as evidence of a sale.   Besides the reasons given, there is another : the Statute of Frauds would stand in the way.   That statute requires every agreement or contract for the sale of lands, to be in writing, and signed by the party to be charged, and, moreover, to be on consideration, and the consideration expressed in the writing.   Now, an authority to another to sell need not express the consideration, though it must, of course, be in writing,—the attorney then stands in the place of the principal; but, standing in the place of the principal, he must then act as the principal would be obliged to act, and must make his contracts in the same way.   An able and learned Judge in Connecticut, held, (*dissentiente*) that a corporation could not authorize a sale or make an attorney, except by writing, signed, etc. ; but the majority held that it could be done by resolution or ordinance.   But, however this may be, it is certain there must be an authority to sell, or an actual sale by the corporation.   Concede that the corporation could authorize a sale by resolution or by ordinance, the question is, has the city done so ?   Not by Ordinance 481, for that was not passed.   Not by 493, for that, though passed, gave no such authority to sell; nor was the sale made under 493, if it did give authority to sell.   Ordinance 493, then, must be construed not as an authority to sell, but as a sale ; but it is not such, for the sale did not occur till afterwards, nor afterwards under that ordinance; nor does it express any consideration, nor mention any parties.   It follows, then, that there was no ratification of the sale, for such ratification could not be made unless by some writing which fulfilled the requirements of the statute; that is, which showed an agreement for the sale on consideration expressed in the writing, and nothing of this kind anywhere appears.   If it be contended that 493 in some way retroacted; that it is to be spliced on to 481, so as to make 481, before void, a valid authority, we say this cannot be done, because it was not so intended, and if so intended, has no such effect.   To say that it does, is to say that merely acting under a power, as if it were a valid power, where there was none, makes it a valid power ; in other words, to appropriate money raised in a particular way, is to affirm that it was legally and properly raised in that way.   So any other appropriation of money raised by ordinance, or pretended to be raised by ordinance, is to validate the ordinance. If this be law, then the council need never have passed any ordi-

nance for the sale of its lands; but it would have been enough to have sold them at private sale, and then an ordinance appropriating part of the money would have validated the private sale. It must be contended, that if a man gives an order for a portion of the money, raised by sale of his land, when the land has been sold without authority, that order is equivalent to a power of attorney under seal to sell the land! This proposition cannot be sustained.

Having received this money by mistake, caused by the misrepresentations of her own agents, is there not an implied contract to pay it back? See Heydenfeldt *v.* Loring, 5 Cal. R.

It is said this is an unjust clam of the plaintiff. How so? We have paid our money—got no title—can get no title—should we not have our money back? Is anything more just than this? It is intimated that we gave too much for the property, and are now trying to get out of a bad bargain. It is harsh enough to hold a man to a hard bargain, when he gets something for what he gives or promises; but to hold a man to a hard bargain, when he gets nothing for his money, would outrage even Shylock's sensibilities, for it would be making the virtue of the contract consist in its exorbitancy. It would be a perfectly good case for us, if we had made a good trade, to offer to rescind it, and get back our money; but as we paid the city too much for the property, we shall neither get the property nor the money! This plea looks more like mockery than logic or justice.

We refer the Court to the opinions in the case of Alvarez *v.* Brannan, and the case of Loring *v.* Heydenfeldt, as settling the equity of our claim.

BURNETT, J., delivered the opinion of the Court—TERRY, J., concurring.

This case was decided at the last October Term, and a rehearing had at the present term. The great importance of the question involved, the large interest to be affected, and the researches of the eminent counsel employed on both sides of the case, have thrown upon the Court a great amount of labor, and greater resposibility. I have given the case the most patient examination my other duties would permit.

The first question naturally presented by the record, and the briefs in the case, is, whether the city of San Francisco, under the provisions of her charter, can make a valid sale of her real estate, without the passage of an ordinance authorizing the sale?

The thirteenth section of article forty-one, page three, of the charter of the city, passed April 15th, 1851, provides, among other things, that the common council " shall have power within the city to pass all proper and necessary laws for the regulation, improvement, and sale, of the city property."

The learned counsel for the city insists, that while the charter

does point out a particular mode in which a given power may be exercised, it does not prescribe it as the *sole* mode; and that the power of sale being inherent in the very nature of the corporation, and being also given by the charter, the city is not precluded from exercising the power in *other* appropriate *modes*.

But in reference to this particular point, the authorities, as well as the reason of the case, seem clearly against it. In the case of Head and Amory *v*. The Providence Insurance Co., (2 Cranch, 166,) it is laid down as a general rule "that a corporation can only act in the manner prescribed by law." So in the case of the Farmers' Loan and Trust Company *v*. Carroll, (5 Barbour S. C. R., 615,) it is substantially held that "when a corporation relies upon a grant of power from the Legislature for authority to do an act, it is as much restricted to the mode prescribed by the statute for its exercise as to the thing allowed to be done." If the charter confers upon the corporation a given power, and at the same time prescribes the *mode* of its exercise, the provisions must be held as dependent, and must be construed accordingly. This view seems to be fully sustained by the former decisions of this Court. 4 Cal. R., 146; 5 Cal. R., 169.

If the position that the city could only sell her real estate by virtue of an ordinance passed for that purpose, be correct, the question then arises, what ordinances were passed by the common council authorizing the sale of property to plaintiff.

An ordinance designated as No. 481, "to provide for the sale of certain city property," passed the board of aldermen by the requisite majority, and upon the vote in the board of assistant aldermen, there were four votes in the affirmative and three in the negative. The latter board consisted of eight members, and there was, at the time, one vacancy. As the four votes in the affirmative did not constitute a majority of all the members elected, this Court decided, in the case of The City of San Francisco *v*. Hazen, 5 Cal. R., 169, that the ordinance was not passed. The ordinance was approved by the mayor on the fifth of December, 1853. This rejected ordinance provided, "that the mayor and joint committee on land-claims should sell, at public auction, certain city property" described therein, among which was the property purchased by the plaintiff. The mayor and land committee proceeded to advertise a sale of the property at auction, as prescribed by the supposed ordinance. The sale was had on the twenty-sixth day of December, 1853. Some half an hour before the sale took place, the common council regularly passed an ordinance, which was properly approved by the mayor, and designated Ordinance No. 493, "appropriating one hundred and eighty-five thousand dollars from the cash proceeds of the second payment for the city property, ordered sold by ordinance numbered four hundred and eighty-one." By the second section, it was provided, "that the comptroller be authorized to issue, on the

day of sale of the property ordered sold by ordinance numbered four hundred and eighty-one, his warrants upon the treasury." "Said warrants shall be payable from the cash proceeds of the second payment for the property ordered sold as aforesaid, or shall be received in payment for any purchases made at said sale in accordance with the terms of Ordinance 481."

The first important inquiry regards the rules of construction justly applicable to this Ordinance No. 493.

In the case of Bailey v. The Mayor and Corporation of New York, Nelson, C. J., speaking of the distinction between the powers of a municipal corporation, as the *owner* of property, and as a subordinate *government*, says: "But the distinction is quite clear and well settled, and the process of separation practicable. To this end, regard should be had, not so much to the nature and character of the various powers conferred, as to the object and purpose of the Legislature in conferring them. If granted for public purposes exclusively, they belong to the corporate body in its public, political, or municipal character. But if the grant was for purposes of private advantage and emolument, though the public may derive a common benefit therefrom, the corporation, *quoad hoc,* is to be regarded as a private company. It stands on the same footing as would any individual or body of persons upon whom the special franchises had been conferred." 3 Hill, 539, and authorities there cited.

So in the case of Lloyd v. The Mayor and Corporation of New York, 1 Selden, 374, it was held by the Court of Appeals, in 1851, that "the corporation of the city of New York possesses two kinds of powers—one governmental and public, and to the extent they are held and exercised, it is clothed with sovereignty; the other private, and to the extent they are held and exercised, is a legal individual. The former are given and used for public purposes, the latter for private purposes." And in the case of Milhan v. Sharp, 15 Barbour, 210, Edwards, C. J., held that the city of New York, so "far as it acts in the exercise of its public political powers, and within the limits of its charter, is vested with the largest discretion; and whether its laws are wise or unwise, whether they are passed from good or bad motives, it is not the province of this Court to inquire. But as regards the acts of the corporation in reference to its private property, it stands upon a very different footing. Such property is held for the common benefit of all the corporators." "The mere fact that the forms of legislation are used, will make no difference in the character of the act. It will be, in no sense, the exercise of a political power delegated for public purposes." It was also held, in that case, that when a municipal corporation acts in reference to its private property, its acts are equally of a private character, and equally subject to judicial control with the acts of a private corporation.

A municipal corporation, from the nature of the ends intended to be accomplished by its creation, is a compound being, acting in different capacities. A private corporation—as, for example, a bank—acts directly only upon its own agents, and for its own private business purposes. A municipal corporation exercises powers of government over others, not its agents. It can pass laws affecting the liberty and property of others, and compel obedience by the infliction of penalties. But in addition to this *governmental power*, it also possesses the capacity to own and dispose of property like an individual, and, like a private corporation, may be a trustee for others. When acting in the capacity of a limited government, and within the limits of its charter, the exercise of its delegated discretion cannot be controlled by the judicial department. But when acting as a trustee, either for the corporation, or for others, or for both, its acts are subject to judicial control. In the latter case its discretion must be exercised soundly, like the discretion of any other trustee.

And this distinction is not affected by the fact that by the law of its creation a municipal corporation can only act through its common council in the form of an ordinance. Nor is it affected by the fact that ordinances "for the regulation, improvement, and sale of city property," are called "*laws*" by the charter of the city of San Francisco. Whatever name the Legislature may give such ordinances, does not change the nature of the ordinances themselves. Acts of Congress respecting the property of the United States, are properly called by the Constitution "*rules and regulations.*"

The legitimate result of this distinction between the governmental and private capacity of a municipal corporation regards: 1. The right·and extent of judicial control. 2. The power to pass retrospective ordinances, and to make binding admissions. 3. The rules of construction applicable to ordinances.

As no judicial control is invoked in this case, it will only be necessary to inquire how far this distinction will affect the decision of this case under the second and third aspects, as above stated. By the act of March 26th, 1851, the State granted to the city of San Francisco, for the term of ninety-nine years, the use and occupation of the beach and water-lots, the State reserving twenty-five per cent. of all moneys arising from the sale or other disposition of the property. The lot purchased by the plaintiff was a part of this property. As the owner or trustee of this property, the city could do any act that a private corporation could with respect to its own property, consistent with the rights of the State, and of individuals, *after* they attached; provided, the *forms* prescribed by the charter were properly pursued. From this it follows that the common council, in the form of an ordinance properly passed, could adopt any precedent act or acts of the city officers, not prejudicial to the existing

rights of the State or of individuals. So, also, it follows, that the city, in the proper form, could make the same binding admissions, not prejudicial to the rights of others, that individuals could make. And hence it also follows, that an ordinance in reference to such a matter is not subject to those rules of interpretation properly applicable to *laws*, as such, but is subject to the same rules of interpretation as the written instruments of individuals.

If these views be correct, the Ordinance 481 .was, in substance, a power of attorney, well drawn, but defectively executed. If it stood alone, any sale made under it would be void. It then becomes necessary to inquire how far Ordinance 493 adopted and sanctioned Ordinance 481; and to ascertain this, we must inquire as to what knowledge the council had in respect to the facts regarding the supposed passage and provisions of 481.

As to the provisions of 481, the council had full knowledge, as is shown by the provisions of 493 itself; and as to the facts regarding the passage of 481, the council had full means of information, and must be bound to know. The second section of the third article of the charter requires each board to keep a journal of its own proceedings, and upon the final passage of every ordinance the ayes and noes shall be taken and entered upon the journal. The council was bound to know the contents of its own journals, as it had the means of knowing, and it was its duty to know. As the organ of the city, in the disposition of city property, the council was bound to know whatever had been done, or not done, by it, in reference to that property. In the case of Alvarez *v* Brannan, we held that an individual was bound to remember his own acts. If he failed to do so, the misfortune or negligence was his own, as well as the consequences. So it is with a municipal corporation in its capacity as the owner of property. ·If the act of the council be unjust in itself, then it will be controlled by the Courts, whether founded upon mistake or not. But if the act be beneficial, though predicated upon a mistake of facts (when knowledge is incumbent), it is still as binding as if actual knowledge existed. It would seem, however, that the only mistake, if any, which was made by the council, was one of law and not of fact. That the council, in passing 493, acted under the mistaken idea that a vote of four members in the board of assistant aldermen was sufficient to pass 481, may be true, and certainly is very probable. But will a municipal corporation, acting under a full knowledge of all the facts, and doing that which in itself is beneficial to its interests as the owner of property, and not at the time inconsistent with the rights of others, be allowed to plead ignorance of the law? And if the corporation could not make this plea, then the party purchasing it could not make it. I cannot understand the practical reason

upon which such a plea could be sustained. The law rewards the diligent and punishes the negligent. If such a ground could be admitted, it would lead a Court into a boundless field of inquiry. The plain, simple, and practical rule, is to require parties to know the law, except in some special cases, when fraud is practiced upon helpless ignorance.

From these views, it follows that the common council had the power to adopt 481, and to give it a retrospective operation, thus recognizing and sanctioning all that had been done up to that time under it, and all that should hereafter be done in pursuance of its terms. Had the council, in the exercise of its governmental powers, passed a retrospective ordinance, it might have been a very different matter. But as the Ordinance 481 only related to the disposition of the city property, and 493 related to the same matter, there could properly be no objection to such action. No rights of individuals had then attached so as to be affected, and this action was no injury to the State, or to the corporators of the city. Whatever an individual could do in the mode appropriate to him, the corporation could do in the mode appropriate to it. Suppose A to make a well drawn power of attorney to B, but there should be a defective execution of the power; and suppose, by another instrument of equal solemnity, duly executed, A should expressly admit the power of attorney to be his act, and predicate the second instrument upon the ground of the validity of the power; and suppose, after this, B should act under the power, would not that action be fully binding upon A, as well as upon the person with whom B dealt as A's attorney? I can see no principle of reason or law that would deny the validity of the act of the attorney.

If, then, the common council must be held to have acted with a full knowledge of all the facts and of the law, and with the right and power to adopt 481, and all the precedent acts done under it, was the Ordinance of 493 a sufficient recognition and adoption of 481, to render the subsequent sale of the city property valid and binding upon all parties? I think it was. The language of 493 is as strong a recognition of 481 as could well be made, not to be in the form of a re-enactment. It expressly assumes the validity of 481, as an ordinance, refers to the sale to be made under it, sets apart a large portion of the proceeds, and makes the warrants issued receivable in payment of purchases made at the sale. In short, the practical vitality of 493 is made to depend upon the expressly recognized validity of 481. Without assuming the validity of 481, there was no basis for 493 to rest upon. The intention to recognize and act upon 481, as a power to sell the city property, is apparent upon the face of Ordinance 493. And the fact that 493 was passed before the sale, and in reference to it, as appears from its provisions, is, in my view, a very strong circumstance to show the intention of the

council.   Had the ordinance been passed after the sale, and after the money had come into the city treasury, it would not afford the same index to the intention in passing it.   In the case of Phelan v. The County of San Francisco, (6 California Reports, 531,) this Court held that taking care of property, already found in the possession of the county, did not make the county liable. And this Court also said in the same case, that the last and only evidence of the acts and intentions of the board of supervisors is to be drawn from the record of its proceedings.   The same rule will apply to the ordinances of the common council, and from them, taken in connection with the rules of law applicable to such cases, I have been led to the conclusion that the sale of the city property, made on the day advertised, was valid and binding upon all the parties.

It may seem that this opinion is in conflict with the decision of this Court in the case of The City of San Francisco v. Hazen, 5 Cal. Rep., 169, but such is not the case.   On the contrary, they are in no conflict whatever.   That and the present case constitute a very apt illustration of a state of case not uncommon in Courts of last resort.   We can only decide upon the case brought before us ; and if parties neglect to bring up all the facts, we cannot supply them.   In the case of Hazen, the ordinance of 493 was not before the Court, and is not alluded to either in the argument of counsel or in the opinion of the Court.   The whole decision in that case turned upon the validity of 481, standing alone by itself.

It is unnecessary to decide the other important points made in the case, as those determined dispose of the whole matter.

For the reasons given, the judgment of the Court below should be reversed, and the case of plaintiff dismissed.

MURRAY, C. J.—I am compelled to dissent from the opinion of a majority of the Court in this case, and shall state my views upon the questions involved as briefly as possible.

I shall assume in the outset, that every sale of lands made by the city of San Francisco, must be in conformity with an ordinance previously passed.   This, I think, is evident from the language of the fourth and thirteenth sections of the third article of the charter.

Let us next inquire into the capacity in which a municipal corporation acts with reference to her private property, and how such acts should be evidenced.

It is contended, upon the authority of several American cases, that the acts of a municipal corporation are of a twofold character : the first political, where they relate to matters which are purely governmental ; and the second private, where they relate to its private property.   That in the former, its ordinances are to be regarded and construed as laws ; in the latter, as mere con-

tracts, subject to the same rules and intendments which would govern the contracts of private individuals. That when a city deals with its property, the doctrine of estoppel, by matters *in pais*, would apply, and that it is responsible in the same manner as other corporations or private individuals are, on their promises, express or implied.

At common law, a corporation could only act by deed under seal, and was not liable on an implied *assumpsit*. 1 Black. Com., 475, Viner's Abridg.; and Kyd on Corporations. See, also, the case of Breckill *v.* Turnpike Company, 1 Dall.; and Gray *v.* The Portland Bank, 3 Mass. In the case of the Mayor of Ludlow *v.* Charlton, 6 Meeson & Welsby, which involves the legality of an executed contract not under seal, the Court say, that the rule of law on this subject, as laid down in all the old authorities is, that a corporation can only bind itself by deed. The exceptions pointed out rather confirm than impeach the rule. " In modern times, a new class of exceptions has arisen. Corporations have of late been established, sometimes by royal charter, more frequently by act of Parliament, for .the purpose of carrying on trading speculations; and where the nature of their constitution has been such as to render the drawing of bills, or the constant making of any particular sort of contracts, necessary for the purposes of the corporation, there the Courts have held that they would imply in those who are, according to the provisions of the charter or act of Parliament, carrrying on the corporation concerns, an authority to do those acts, without which the corporation could not subsist. This principle will fully warrant the recent decision of the Court of Queen's Bench, in Beverly *v.* Lincoln Gas-Light and Coke Company, 6 Ad. & El., 829.

" Before dismissing this case, we feel ourselves called upon to say, that the rule of law requiring contracts entered into by corporations to be generally entered into under seal, and not by parol,. appears to us to be one by no means of a merely technical nature, or which it would be at all safe to relax, except in cases warranted by the principles to which we have already adverted. The seal is required as authenticating the concurrence of the whole body corporate. If the Legislature, in erecting a body corporate, invest any member of it, either expressly or impliedly, with authority to bind the whole body, by his mere signature, or otherwise, then, undoubtedly, the adding a seal would be matter purely of form, and not of substance. Every one becoming a member of such corporation, knows that he is liable to be bound in his corporate character by such an act; and persons dealing with the corporation know that by such an act the body will be known. But in other cases, the seal is the only authentic evidence of what the corporation has done, or agreed to do. The resolution of a meeting, however numerously attended, is, after all, not the act of the whole body. Every member knows he is

25

bound by what is done under the corporate seal, and by nothing else. It is a great mistake, therefore, to speak of the necessity for a seal, as a relic of ignorant times. It is no such thing. Either a seal, or some substitute for a seal, which, by law, shall be taken as conclusively evidencing the sense of the whole body corporate, is a necessity inherent in the very nature of a corporation, and the attempt to get rid of the old doctrine, by treating as valid, contracts made with particular members, and which do not come within the exceptions to which we have adverted, might be productive of great inconvenience."

In the subsequent case, of Arnold v. The Mayor of Poole, 4 Man. & Gran., the same question came before the Court of Common Pleas, and the case of Ludlow v. Charlton was cited with approbation—the Court holding that the old rule had not been relaxed, except as to trading corporations, and that it would be unwise to extend it to municipal corporations.

I have cited these authorities for the purpose of showing that whatever may be the rule in the United States, the Courts of England recognize a distinction between mere moneyed or trading corporations, and those of a municipal character; that with regard to the latter they have refused to relax the rule, holding, upon grounds of obvious policy, that they are not liable, except in cases where their intention to contract is authenticated in the mode pointed out by the law. The wisdom of this rule is apparent. If a corporation could bind itself in any other way than the mode prescribed, of what use would be its charter? It would be continually working outside of its charter, by invoking the doctrine of implied assumpsit, estoppel, ratification, and the like, and the singular anomaly presented of an inferior creature of legislative creation, accomplishing, indirectly, what it was expressly prohibited from doing.

In this State, where it is not necessary that the acts of a municipal incorporation should be done under seal, but where the body corporate acts through the medium of its agents, the mayor and aldermen, whose will is manifested by laws or ordinances, it would seem but reasonable, following the doctrine of the English Courts, that in all cases the intention of the corporation should be promulgated in the form of an ordinance, and without which it ought not to be held legally liable.

Assuming, then, for the present, that an ordinance is necessary in all cases to enable the city to act, and also, that it is expressly required by the charter, in the sale of lands by the city; let us first inquire if such an ordinance is a public act or law, or whether, on the other hand, it is a mere power of sale, to be construed like the acts of individuals. Admitting, for the purposes of this argument, that the functions of the corporation are, as a general rule, two-fold, still it will not be denied, that the Legislature, which is the creator, can give such color or charac-

ter to the acts of an incorporation as it may deem fit; it may permit it to act through its executive officers or forbid it from acting except by ordinance; it may limit or enlarge the powers of the common council, and may determine that its acts shall only be of a public legal character.

The thirteenth section of the third article of the charter provides, that " the common council shall have power to pass all proper and necessary laws for the regulation, improvement, and sale of the city property, etc." Now, if the words of the charter mean anything, it is, that the property of the city can only be disposed of *by law*, and if an ordinance for this purpose is a law, then it must be governed by the same rules of construction as any other legislative act. In other words, the charter provides that the will of the common council shall be made manifest, by means of law or an ordinance. An ordinance is defined to be a law of an inferior jurisdiction or corporation, and the words *law* and *ordinance* are used in the charter as synonymous. If, then, a law must be first passed to enable the city to dispose of her property, by what mode of reasoning can it be maintained, that after its passage it shall not be construed as a law, but only as a contract; that though defective as an ordinance, it is good as a power. The virtue of the power must certainly depend on the legality of the ordinance.

What is the difference between a disposition of lands belonging to the State by an act of the Legislature, and the disposition of lands belonging to a corporation by the common council? They both hold them alike in trust for their citizens. If the State should sell her property to A, who paid the price agreed upon, and the act was void for some reason or another, would any one contend that the receipt of the money estopped the State from denying the validity of A's title? Or if A, by fraud and collusion obtained a grant from the State through her Legislature, and the act was regular, would the fraud of A, or of the agents of the State vitiate the grant? Certainly not. There is no reason in the nature of things, why there should be any difference in the two cases, or why an act, which is confessedly political when done by the Legislature, should not be so when performed by a municipal incorporation. The argument in some of the cases cited, seems to proceed on the supposition, that the officers of a city are less honest than those of a State, and therefore less to be trusted. This may be true in fact, but has not been so long recognized or accepted as to become a legal maxim or presumption.

If the act of the common council is to be considered as a law, then it would follow that Ordinance 481, not having passed by the requisite number of votes, and being void, as before declared, was not adopted, affirmed, or ratified, by Ordinance 493; as a law can never be passed or ratified by mere relation. And further,

because 493 does not in any way attempt to ratify or confirm the previous ordinance. Admitting, however, for the purpose of argument, that these ordinances are not laws, but simple powers to be construed like the written contracts of private individuals, it then becomes a question of construction as to what was the intention of the council in passing 493.

It is assumed that 481 is a power of attorney, well drawn, but defectively executed; that the common council had full power to ratify or confirm it; that they were bound to know the law, as to how many votes were necessary to pass an ordinance, and, knowing the law, they were acquainted with the fact that 481 had not been passed, and, in view of the presumption that every one knows the law, it is assumed that the common council, knowing, when they passed 493, that 481 had not passed, must be supposed to have acted upon that knowledge, with the intention of affirming Ordinance 481. The law and the logic of this proposition are equally bad.

The error is two-fold : First, in assuming, as a matter of fact, that each member of both boards knew that 481 had not passed; and, Second, in supposing that a knowledge of the law, viz. : that 481 had not legally passed, is to be presumed, and that therefore the passage of 493 must be construed as intended to pass 481. The common council, or rather the members, were bound to know that a certain vote was necessary to pass an ordinance, but the members of one board were not bound to know the vote by which the ordinance was passed in the other. If the ordinance is to be construed as a law, they would be charged with notice of the vote by which it passed, but if as a power of attorney, then they are only bound to know the general law with regard to the execution of the power, and the power being regular on its face, all facts and circumstances which may tend to vitiate, or render it null, must be brought home to the knowledge of the parties, by actual notice. To illustrate the proposition : if I should receive a power of attorney, executed and acknowledged in due form, I could not be charged with notice, as a legal consequence, following from the power, that it had been obtained by fraud or duress.

Again, 481 was not " a power of attorney, well drawn but defectively executed." It was, for all intents and purposes, a blank paper; its validity depended wholly on its execution, and not having been executed in the manner pointed out by law, it was void and worthless. It is perfectly clear that, in passing 493, the common council had no intention to ratify or adopt 481, but simply to dispose of the money arising from the sale, which they supposed was properly ordered by that ordinance. If such had been their intention, how easily they could have expressed it. A single word would have been sufficient. But, says the appellant, the council knew that 481 had not passed; they must

Holland v. City of San Francisco.

be presumed to have acted on this knowledge.. Grant the fact that they did; this presumption could only be used for the purposes of construing the second ordinance, and ascertaining the intention of the council. It could not be used for the purpose of overthrowing or disproving the intention, as manifested by the paper itself. Such a rule would force a legal fiction over the truth, and thereby alter the true character of the contract.

Ordinance 493 does not, in terms, or by implication, adopt, or purport to adopt, 481. It refers to the latter ordinance as having passed, not with a view to ratify it, but to appropriate the proceeds of the sales arising under it, and treats it as an antecedent act, properly done; and the plain inference from the language itself, aside from any legal presumption, is, that the council supposed that the ordinance had passed by a legal vote, and that there was therefore no necessity for its adoption, as their minds were not drawn to the fact of its illegality. Under these circumstances, some of the very members who had voted against the sale, believing that it was valid, might have, and doubtless did, vote for the appropriation of the proceeds of such sale, without ever supposing that their acts were to be considered as confirmatory of an ordinance which they had opposed.

The error consists in supposing that a person or corporation acts with knowledge of the law, and is to be held as if so acting, when it is proved by the paper that he has acted in ignorance of the law.

We are not now construing a contract, for there was no contract at the time; but we are seeking for a power of sale, and to do this it is only necessary to ascertain the intention of the party making the alleged power. This can only be done by looking at the instrument itself and the surrounding circumstances; these may show an intention to give a power or not; and this intention necessarily refers itself to the state of the mind, the knowledge or ignorance of the party, as shown by the paper and the facts. But it is contended that we cannot examine the ordinance to prove that there was no intention to give the power, by showing that the counsel had, as they thought, already given it. In other words, that the fiction of the law which supposes any one knew it, is to be carried to the extent of supposing the party knew what he says on the paper; he did not know, indeed, more than this. It is carried to the extreme of holding, by inference, that the council knew the law had not passed, when the paper shows that they supposed it had passed. Now, as this is a question of construction, and construction follows intention, why cannot a mistake of law be shown in the ordinance to be construed as well as any fact, with the view of showing what was the intention of the parties? If A made a deed to C, reciting that he had made a will in his favor, which was by law irrevocable, and vested an immediate estate in C,

and, therefore, by way of confirmation, he made the deed, I apprehend that this mistake of law, being recited in the instrument, would not be controlled by the legal fiction, that he was presumed to know that he had made no present disposition of the property by will. But suppose that he merely recited that he had made such disposition, would any one contend that this recital was evidence of, and validate it?

In construing a power, it is true, you may look to the law bearing upon anything embraced within the power; and so in seeing whether a paper is a power, you look to the law, but you must look to the words and germain facts, too, to see what the maker intended to do. Admit that the council did act with knowledge of a certain legal principle, viz.: that 481 had not passed, does it follow that when a sale was about to be had, that the mere disposition of certain proceeds of sale, was meant to order a sale, or a mere recital that an ordinance had passed, shows a present intention to pass the ordinance?

The whole question involved is one of intention, viz.: whether the council meant, in 493, to pass 481; and when we see, from the face of it, that no such intention existed, it matters nothing whether the council were laboring under a mistake of fact, or law. The intention, whatever it was, is to prevail; and it makes no difference in this respect, whether the ordinance 493 is to be construed as a law or as a power. 9 B. Monroe, 416.

In this case it was held, that in a suit upon a note, not executed by the defendants, but which, it was contended, they had recognized and assumed, "to render the note their note, the defendants must have recognized it with the intention of thereby making it their note, with the knowledge of the fact that without such recognition they would not be responsible. But if the recognition was made under a mistaken apprehension of their liability, either as to the fact or to the law, then such recognition would not be obligatory upon them, and the note would not thereby become their note." In Cockerel *v.* Cholmely, 3 Eng. Ch. Rep., 1 Russell and Mylne, it was held in order to work a confirmation, that the party said to confirm must know the law and fact.

In discussing this point, the Court say: "It has been argued that the defendant, being aware of the facts in the lifetime of Sir Edward Engeldfield, has, by his silence, and by being a party to the application of the party to Parliament, confirmed the title of the plaintiffs. In equity, it is considered, as good sense requires it should be, that no man can be held by an act of his to confirm a title, unless he be fully aware, at the time, not only of the fact on which the defect of title depends, but of the consequences in point of law. And here there is no proof that the defendant, at the time of the acts referred to, was aware of the law on the

subject, nor was it even alleged in the argument." See, also, the case of Portman v. Mill, 2 Russell.

If these cases are to be regarded as authority, they establish the conclusion, that in cases involving a question of confirmation, a party is not presumed necessarily to know the law; that this is a question of fact to be established, and that even admitting the presumption may arise, it is not conclusive as against the facts, which go to establish ignorance of the law. If these conclusions are correct, and I am unable to see wherein they are erroneous, then the argument drawn from the supposed knowledge of the law, upon the part of the common council, must fall to the ground.

But, again, I am of opinion that, in the sale of this property, the city acted in the capacity of a trustee, or agent, of the State, under a delegated statutory power; that the law, having provided the mode in which the power shall be exercised, that mode, and none other, can be pursued.

In all the cases cited by the appellant, the corporation was the sole owner of the land or property, and in no case was she an agent, trustee, or tenant, in common with another. While I might be willing to admit, that as to her separate property, her acts were to be construed like those of ordinary individuals; in a case like the present, where the State has given to the city, lands to be disposed of for their mutual benefit, in a certain way, viz : by law, I think that the power must be strictly followed, and the ordinance construed as a law affecting the property of the State and city; otherwise the city, a mere co-tenant or trustee, might defeat the interest of the State in the property, by attempting to deal with it as a private proprietor.

There are several other points involved in this case, none of which are of serious importance, and I shall not therefore consider them at any length. It is contended that the plaintiff cannot recover, because the city is prohibited from contracting a debt of more than fifty thousand dollars, over and above her outstanding or aggregate indebtedness. This provision applies to the acts or contracts of the city, not to liabilities which the law may cast upon her. It was designed to prevent an extravagant expenditure of money, by limiting the common council in the matter of contracts and appropriations, not to authorize the city to commit torts, and to obtain the property of her corporators, without being legally liable. According to the argument, if the city had obtained judgment for an hundred thousand dollars against A, and had sold his property and made the money, which was then in the treasury, and the judgment should afterwards be finally reversed, neither A, nor the purchaser, would have any right to recover back the amount. Such never was the intention of the Legislature, and the proposition is not worthy of serious consideration.

With regard to the question of ratification : if Ordinance 493 did not adopt 481, the sale was void, and the plaintiffs were not estopped by their acts.   Estoppels must be mutual, and as the city was not bound, neither could the plaintiffs be.   Phelan v. the County of San Francisco, October Term, 1856.   See also, Portman v. Mill, 2 Russell.

It will hardly be necessary to adduce any argument to establish the proposition that the former opinion of this Court was erroneous.   A mere reference to it is sufficient, and the point on which it was predicated seems to have been abandoned by the unanimous consent of the Court and counsel.

For the foregoing reasons, I am of opinion that the judgment should be affirmed.